7226

GREENVILLE-CAROLINA POWER CO. v. UNITED STATES
FIDELITY AND GUARANTY CO.

1. Sureties—Contracts.—The findings of fact by the Circuit Judge in this case as to misrepresentation of physical conditions, failure to disclose facts discovered after contractors began work, and advance payments, *held* to have support in the testimony and upon the facts so found, the defendant guaranty company is liable on its surety bond for the failure of its principal to faithfully perform its contract in constructing a dam.

2. Rehearing refused.

Before Hydrick, J., Greenville, May, 1908. Affirmed.

Action by Greenville-Carolina Power Company against United States Fidelity and Guaranty Company. The Circuit decree is:

"This is an action to recover $25,000, the penalty of a bond given to Federal Construction Company and Saluda River Power Company by John F. Grandy & Son, as principals, and the defendant as surety, for the faithful performance of a contract made by Grandy & Son with Federal Construction Company to furnish all the materials and do all the work necessary to build a dam and power house on Saluda River, near Greenville, S. C., according to plans and specifications prepared by Lockwood, Green & Company, engineers.

"A jury trial was waived and the case was heard by the Court.

"The plaintiff is the successor of Saluda River Power Company, and has, by assignment, all the rights of Federal Construction Company in the contract and bond.

"The plans and profiles of the dam, upon which the bidders based their estimates, showed the approximate line of the ledge of solid rock in the bed of the river and the adjacent banks upon which the dam was to be built. This line was ascertained by soundings made in the river with a steel rod, and by test pits dug on the banks along the proposed line of the dam.

"The invitation for bids contained the following statement: 'It is very desirable that all bidders should visit the site of the dam to observe the character of the country and the exceptional advantages afforded for cheap construction natural conditions. It is believed abundance of stone for use in the concrete can be secured from the steep hillsides along the river, and that plenty of sand can be secured from bars, where it has been deposited along the river near the site, but no guarantee is made on these points. * * * It has been the endeavor to have the plans and specifications indicate clearly and definitely the intent of the work, and

your proposals are accepted based on these plans and specifications, any variations therefrom to be taken account of and allowed for by the resident engineer as the work proceeds, on a suitable basis of unit prices which you will name with your proposal.'

"The contract provides that the dam shall be built on the solid ledge under the river. bed, and provision is made for variations from the plans and specifications 'in order to meet the natural and unforseen conditions of the site and still secure the prescribed limits of safety.'

"Before making their bid, Grandy & Son examined the site. They sounded in the river with a steel rod, and in the test pits made by the engineers, and became satisfied that the approximate ledge line and the other physical conditions were represented in the plans and profiles with conservative accuracy. Their bid was $98,460. The next lowest bid was $115,000. The highest bid was $185,000.

"Although their experience with that kind of work was limited, they were anxious to get the contract, and brought to bear all influences they could to get it.

"In the letter accepting their bid, which is dated June 3, 1905, they were informed that a surety bond for $25,000 would be required. As they had put in their estimate the premium on a bond for only $15,000, the company agreed to pay the additional premium for a $25,000 bond.

"They began work about the 7th or 8th of June and abandoned it about the middle of December. It was completed by another contractor. The total cost was $213,499. If the Grandys had carried out the contract they would have received about $121,871. So the dam and power house cost $91,628 more than the Grandys agreed to build it for. The great increase over the estimated cost is accounted for, in part, by unforseen conditions, a great increase in the price of labor and materials, the change in contractors, which necessitated a change of the equipment, and perhaps, also, by the fact that the Grandys' bid was too low.

"After they had been at work some weeks, and before the formal contract was signed, they discovered that the stone which they had expected to use in the dam was unsuitable, and that they would have to excavate deeper than they expected to secure a solid foundation for the dam.

"On account of these developments they became discouraged. They asked for and had a conference with the president of the company and the resident engineer at the site, where these unforseen conditions and difficulties were discussed, especially the difficulty of getting suitable stone. They say that they decided to give up the contract unless they could get assurances from the company and engineers that they would receive such compensation, on account of the unforseen difficulties, as would make them whole, and that such assurances were given them. This is denied by the president of the company and the resident engineer.

"However, they afterwards signed the contract, without having any provision inserted therein with regard to such compensation.

"These unforseen conditions were not made known to the defendant by any of the parties interested. It does not appear whether the defendant was otherwise informed of them. None of the parties interested, except the Grandys, knew that the defendant had been applied to for the bond until the bond, signed by the defendant, was tendered to the company. No inquiries were made of the company, the owners or the engineers by the defendant. The Grandys and the local agent of the defendant urged the acceptance of the bond.

"The methods employed to ascertain the ledge line were such as are ordinarily employed by competent and skillful engineers, and they usually prove to be correct within reasonable limitations. But in this instance the variations on the banks of the river were very great. The contractors knew, however, what methods had been employed, and themselves employed the same methods in their own investiga-

tions, and were satisfied the results were truly represented in the drawings, as in fact they were.

"The defenses are:

1. "A general denial.

2. "Misrepresentation on the plans of the physical conditions and fraudulent concealment of the facts in regard to them.

3. "The failure to disclose the facts discovered after the contractors began work, the inducing them to sign the formal contract and procure the bond under agreement to make them whole and pay part of the premiums for the bond.

4. "The loan of $8,000 to Grandy & Son by Colonial Securities Company, which is alleged to have been an advance payment on the contract.

5. "Anticipated or advance payments in variation of the contract.

"The first and second defenses are disposed of by the statement of facts.

"The third defense depends upon the extent to which that good faith, which must be exercised by the obligee in dealing with the surety, requires the obligee to disclose to the surety facts known to him which might operate upon the mind of the surety in making the contract.

"On the other hand, it is certain that the obligee must not, directly or indirectly, misrepresent or conceal material facts, which he ought to disclose, and he must answer truly all inquiries concerning them.

"On the other hand, it is equally certain that the relation does not require the voluntary disclosure in all cases of all matters, known to the obligee, which he may reasonably suppose would affect the mind of the surety. The surety can not act supinely. He must exercise proper diligence to ascertain the liability which he incurs. The difficulty lies in determining just what facts the obligee must disclose,

and under what circumstances the law makes it the duty of the obligee to disclose them.

"To render the allegation of concealment sufficient it is necessary to show that the creditor either procured the surety's signature, or was present when the instrument was executed, and then misrepresentation of material facts, which should have been disclosed. *Magee* v. *Manhattan Life Ins. Co.,* 92 U. S., 99. 'The test,' says Chancellor Kent, 'is whether one of the parties knowingly suffered the other to deal under a delusion.' 2 Kent Com., 643.

"For general statements by other authorities of the circumstances requiring disclosure, see *Franklin Bank* v. *Cooper,* 36 Me., 176, 196; *Jungle* v. *Halbrook,* 62 Am. St. Rep., 923; *Fassnacht* v. *Emmig Gagen Co.,* 63 Am. St. Rep., 325, and notes; Brandt on Suretyship, 420.

"In *W. C. & A. R. R. Co.* v. *Ling,* 18 S. C., 120, our own Supreme Court says: 'There must be some positive act of concealment or misrepresentation on the part of the obligee, in cases like this before the Court, as to some fact which it was his duty to discharge (disclose), before the sureties can be relieved. Silence, merely, especially as to facts within the reach of proper inquiry by the sureties, will not be sufficient. The law stands between the parties perfectly impartial, ready to rebuke fraud, concealment or misrepresentation on the part of either, but carelessness and want of proper vigilance are left to their own fruits. There must be an intent to deceive, not a mere passive omission to state everything within the knowledge of the creditor. The intent is the gist of the fraud, and this should be made to appear.'

"It was the duty of the contractors to inform their surety of the unforseen conditions which had developed, and if they failed to do so the plaintiff is not responsible, unless the plaintiff knew that the contractors had not done so and that the surety was relying upon the conditions as represented in the drawings. There is no testimony tending to show that the Construction Company, the plaintiff, or the

engineers knew that the contractors had not fully informed the defendant of the then existing conditions, or that the defendant was ignorant of them. In fact, it is only an inference that the defendant acted upon the drawings, though I think the inference that it did reasonable. As no inquiries were made of any of the parties connected with the plaintiff, I think they had the right to assume that the Grandys had done their duty and informed the defendant of the conditions as they had then developed, and hence it was not incumbent upon them to volunteer any information in regard to them. *Page* v. *Kreky,* 137 N. Y., 307, 21 L. R. A., 409, and notes. The defendant must have known that the Grandys had been at work for some time before the bond was executed, because it refers to the contract as dated June 3d, and the bond is dated July 21st. At least that was sufficient to excite inquiry, which would probably have disclosed the then existing conditions.

"The contractors say they knew at the time of the conference it would be impossible for them to complete the work at the contract price, and that they would not have signed the formal contract and procured the bond but for the assurances made them by the plaintiff and engineers that they would be made whole. The fact that they did sign the contract and did not have that agreement inserted into it militates very much against that position. If the parties made that agreement it should, by all means, have been put into the written contract, which is conclusively presumed to embody all prior negotiations. I conclude from the testimony and from their signing the contract and procuring the bond, after the conference at the dam, that while the unforseen conditions had then developed sufficiently to greatly discourage them, they had not developed as fully as they did afterwards; for it is not reasonable to suppose that they would have gone forward in the face of difficulties which they then knew would result inevitably in their financial

ruin. It is often difficult to remember past occurrences, except as colored by the light of subsequent events.

"The fourth defense charges that Colonial Securities Company and Federal Construction Company were substantially the same corporation, and that after the contract was made the Colonial Securities Company advanced the contractors $8,000, which was an advance payment in violation of the terms of the contract, and to the prejudice of the surety, whereby it is, discharged. Colonial Securities Company is a corporation engaged in a general banking business and in financing development enterprises. It signed the contract as surety or guarantor of the Federal Construction Company. At the time of the contract it held all the stock of the Federal Construction Company. Some of its stockholders were also stockholders and officers in Federal Construction Company and Saluda River Power Company, and, of course, to that extent, they were interested in the performance by the contractors of their contract. But the testimony shows no other connection between these companies or interests in the affairs of each other. It also shows that the transaction in question was a loan and not an advance payment for or on account of Federal Construction Company or Saluda River Power Company.

"The fifth defense also charges generally that the contract was violated by the making of advance or anticipated payments. The payment relied upon is that for structural steel, which was at the railroad sidetrack, some two or three miles from the dam, where the material shipped in by the railroad was delivered to the contractors. The estimate of September 2d contained this item: 'Structural steel delivered on ground at oil switch, 118,100 lbs. at .03, $3,543.' The amount of this estimate was certified to be due, under the terms of the contract, by the engineers, and paid by the company.

"Advance payments, or payments of amounts greater than is due under the terms of the contract, will ordinarily dis-

7—83

charge the surety. *Greenville* v. *Ormand,* 51 S. C., 121, 28 S. E., 50.

"It is contended that the surety is a favorite of the law, and is entitled to stand upon the strict terms of his contract; and that any material variation or alteration thereof, without his consent, will operate to discharge him from liability.

"While that is true, the contract must receive a just and reasonable interpretation, with a view to ascertaining the intentions of the parties, which, when discovered, must control, for the bond is, by its terms, subject to the contract, and the surety thereby becomes a party to the contract.

"The rule is applied with greater strictness in cases where there has been an alteration of a written agreement than in cases where there has been only a breach or a variation from the terms of the contract. In the latter, the inquiry is whether the surety's security has been lessened by what has been done by the creditor.

"*Calvert* v. *Dock Company,* 2 Keen, 644. Moreover, the rule of *strictissimi juris* does not apply to the case of a compensated surety. *Walker* v. *Holtzclaw,* 57 S. C., 466, 35 S. E., 754; *Cowles* v. *U. S. Fid. & Guar. Co.,* 98 Am. St. Rep., 840, and notes; *Remington* v. *Fid. & etc. Co.,* 67 Pac. R., 989.

"The compensated surety is regarded rather as an insurer, and his contract one of insurance. This class of sureties seeks the business for the profit there is in it. The risk is carefully considered, usually by experts, and the compensation, which is proportioned to the risk, is usually, and especially in cases like this, included in the estimates of the bidders and paid by the obligee.

" 'The only proper solution of the problem seems to be that adopted by so many courts of high authority, namely: to treat the compensated surety in all cases as an insurer, subject in all respects to the general principles of insurance law, modified to a limited extent by the *quasi* suretyship nature of the contract, arising from the dual relationship

sustained by the insurer to the insured and the "risk." Frost Guar. Ins., sec. 4.'

"In the light of the foregoing principles let us examine the provisions of this contract relative to the matter of payments.

" 'On the first day of each month, during the progress of said work, the company, through the engineers, shall estimate the value of the work completed and materials furnished and put in place during the previous month, and within five days thereafter eighty-five (85 per cent.) per cent. of the value thus determined ————— shall be paid to the contractor ————. All payments shall be made only upon certificates of the engineers, and based upon their estimates of the amount of work done and materials furnished.'

"Taking the language of the first part of the section and the second part, above quoted, together, I think there can be no doubt that it expresses the intention that payment should be made for 'materials furnished.' This construction is strengthened by reading the whole contract, where reference is made to the matter of payments. In construing a contract we must not be governed by fragmentary parts of it, but it must be considered as a whole, and every part must be given some meaning and effect, if practicable, and such meaning and effect as will make it a consistent whole. To say that payment for 'materials furnished' is not required would render those words, in the sentence last quoted, nugatory.

"But if this were not so, the fact that it was estimated and certified by the engineers is, I think, conclusive of the question; for the contract provides that payments shall be made only upon the estimates and certificates of the engineers; and, further, that 'if any question or dispute shall arise during the progress of the work ————— as to the certifying or auditing of accounts, it is to be referred at once to the said engineers, whose decision thereof shall be binding and conclusive upon both parties.'

"Such a stipulation is valid, and the decision of the engineers, in the absence of fraud or collusion or mistake so gross as to imply bad faith, or the failure to exercise an honest judgment, is binding upon the parties to the contract. *Sullivan* v. *Byrne,* 10 S. C., 122; *Killberg* v. *U. S.,* 97 U. S., 398; *Boettler* v. *Tendick,* 5 L. R. A., 270, 44 N. W., 2; *Elliott* v. *Missouri etc. R. R. Co.,* 21 C. C. A., 5; *Choctaw etc. Co.* v. *Newton,* 71 C. C. A., 655.

"In the case of *Boettler* v. *Tendick, supra,* it was contended that the decision of the architects was not final and binding unless made after a controversy had actually arisen, but it was held otherwise.

"Even if the engineers erred in construing the contract, which I do not think they did, the surety should not be released on that account. To so hold would be to discharge the surety in nearly every case of a building contract, for they are rarely completed without some variations or departures from the strict terms of the contract, and engineers and architects are not, as a rule, learned in the law of the construction of contracts.

"The case of *City of New Haven* v. *National Steam Economizer Co.,* 65 Atlantic Reporter, 959, was similar to this case in sereval respects. In that case the Supreme Court of Connecticut says: 'It is unnecessary to inquire whether, under the terms of the instrument, when such certificates were given, the plaintiff, in the absence of collusion and unfair dealing, was or was not under a present legal duty enforceable at law to pay to the contractor the amounts so certified. He was at least entitled to make the payments, and was under no duty to review or revise the work which the parties had committed to the architects,' citing *McAvoy* v. *Loud,* 13, 111, 147; *Chapman* v. *Kansas City & R. R. Co.,* 114 Mo., 542, 549, 21 S. W., 858; *Chapman* v. *Eneberg,* 95 Mo. App., 127, 68 S. W., 974. See, also, *Hand Mfg. Co.* v. *Harks,* 36 Or., 235, 59 Pac. Rep., 549; *Grafton* v. *Homkly,* 86 S. W. Rep., 859.

"The estimate and certificate was made in good faith, and was paid in good faith, and the surety is not thereby discharged.

"It is, therefore, ordered and adjudged that the plaintiff, Greenville-Carolina Power Company, do recover of the defendant, The United States Fidelity and Guaranty Company, the sum of twenty-five thousand ($25,000) dollars, and the cost of the action."

From this decree the defendant appeals.

*Mr. Jos. A. McCullough,* for appellant, cites: *It was duty of plaintiff to inform defendant of conditions unfavorable existing at execution of bond:* 14 Ency., 72, 79; 50 S. C., 402; 27 Ency., 443, 460; 63 Am. St. R., 327; 58 Am. Dec., 769; 20 Cyc., 1419; 6 Current L., 1597; 21 L. R. A., 411; 4 McC., 171; 1 Black, 465; 96 N. W., 918; 71 N. W., 710; 62 Am. St. R., 921; 18 S. C., 119; 63 Am. St. R., 336; 61 S. C., 190; 69 N. E., 693. *As to the construction of the contract in behalf of surety:* 12 Cyc., 1425; 89 Fed., 925; 131 Fed., 209; 7 Current L., 481; 145 Fed. R., 148; 92 Fed. R., 550; 96 S. W., 745; 52 N. W., 1110; 28 S. W., 439; 67 N. W., 913; 53 L. R. A., 613; 57 Fed. R., 179; 152 Fed., 956; 31 N. W., 862.

*Messrs. Haynesworth, Patterson & Blythe,* contra, cite: *As to misrepresentation of physical conditions:* 103 Fed., 609; 44 N. W., 1. *Duty of one receiving an obligation to make disclosure to the surety:* 14 L. R. A. (N. S.), 377; 92 U. S., 293; 100 N. W., 629; 18 S. C., 116. *Payment for materials delivered is not advance payment:* 13 C. C. A., 572; 42 N. E., 670; 205 U. S., 105. *Construction of contracts of compensated sureties:* 170 U. S., 133; 98 Am. St. R., 838; 67 Pac., 989; 57 S. C., 466; 1 Cool. Briefs on Ins. L., 634; Frost Law of Guaranty Ins., 15, 16, 27; 19 C. C. A., 281; 26 C. C. A., 146; 11 C. C. A., 96; 19 C. C. A., 264; 17 C. C. A., 56; 34 C. C. A., 164; 66 N. W., 528; 191

U. S., 416; 13 Ency., 10. *Power of engineers to settle differences given in contract is binding on both parties:* 5 L. R. A., 270; 70 N. E., 347; 21 C. C. A., 5; 71 C. C. A., 655; 114 U. S., 549; 10 S. C., 122; 106 U. S., 388; 72 N. E., 347; 86 Ill., 78; 68 S. W., 974; 65 L. R. A., 962.

This opinion was filed May 8, 1909, but remittitur held up on petition for rehearing until

June 18, 1909. The opinion of the Court was delivered by

Mr. Chief Justice Jones. The plaintiff sued defendant upon a $25,000 bond, guaranteeing the faithful performance of a contract by John F. Grady & Son for the construction of a dam and power house for plaintiff on Saluda River, in Greenville county, S. C.

The issues were by consent submitted to Judge Hydrick, without a jury, and judgment was rendered against defendant for $25,000.

This being a case at law, it is conceded that the Supreme Court has no jurisdiction to review the findings of fact by the Circuit Court, where there is any testimony whatever in support of the same.

After careful consideration, we conclude that the findings of fact by Judge Hydrick, whose decree is herewith reported, have support in the testimony, and that upon the facts so found he properly adjudged the defendant was liable upon the bond.

The judgment of the Circuit Court is affirmed.

June 18, 1909. Per Curiam. After careful consideration the Court is unable to discover that any material question of law or fact has been overlooked or disregarded.

It is, therefore, ordered that the petition herein be dismissed and the order staying remittitur heretofore granted be revoked.